TIMOTHY COURCHAINE
  U.S. Attorney for the District of Arizona
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
(602) 514-7500

BRETT A. SHUMATE
  Assistant Attorney General
  Civil Division

YAAKOV M. ROTH
  Principal Deputy Assistant Attorney
  General

TIBERIUS DAVIS
  Counsel to the Assistant Attorney
  General
450 5th St NW,
Washington, DC 20001
Tiberius.davis@usdoj.gov
202-860-8970
*Attorneys for the United States of
America*

TYLER S. BADGLEY
  General Counsel
M. JORDAN MINOT
  Deputy General Counsel
ANNE STUKES
  Senior Assistant General Counsel
CARLIN METZGER
  Assistant General Counsel
U.S. Commodity Futures Trading
  Commission
Three Lafayette Center
1155 21st Street, NW
Washington, DC 20581
Email: jminot@cftc.gov
Phone: (202) 418-5000
*Attorneys for the Commodity Futures Trading
Commission*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| THE UNITED STATES OF AMERICA; <br><br> and <br><br> COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF ARIZONA; KATIE HOBBS, in her official capacity as Governor of Arizona; ARIZONA DEPARTMENT OF GAMING; KRISTIN K. MAYES, in her official capacity as Attorney General for the State of Arizona; JACKIE JOHNSON, in her official capacity as Director of the Arizona Department of Gaming; DOUGLAS JENSEN, in his official capacity as Chief Law Enforcement Officer of the Arizona Department of Gaming, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs, the United States of America and the Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through their undersigned counsel, bring this civil action for declaratory and injunctive relief, and allege as follows:

## I.      INTRODUCTION

1.      The Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. §1, *et seq.*, provides a comprehensive regulatory framework for the regulation of derivatives transactions in the United States.  This federal law designates the CFTC as the federal agency with "exclusive jurisdiction" over the regulation of futures, options, and swaps traded on federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A). Plaintiffs bring this action in response to Defendants' criminal prosecution and sending of cease and desist letters to CFTC-regulated entities in which Defendants assert that Arizona law permits Defendants to regulate markets over which Congress has granted "exclusive jurisdiction" to regulate to the CFTC.

2.      The CFTC brings this action in response to the State of Arizona's filing of a criminal Information against a CFTC-regulated "Designated Contract Market" (DCM) for doing precisely what is permitted under federal law.  On May 21, 2025, the Arizona Department of Gaming sent CFTC-regulated DCM Kalshi a cease-and-desist letter stating that offering event contracts, including sports event contracts, based on future events without a license violated Arizona law.  The letter directed Kalshi to "cease gambling operations in Arizona and desist from engaging in those activities in the future" and threatened Kalshi with criminal penalties if it did not comply.  On March 17, 2026, Arizona filed criminal charges against CFTC-registered DCM KalshiEX LLC, alleging that Kalshi has operated an illegal gambling business in Arizona without a license and for "election wagering." *Arizona v. KalshiEX LLC*, No. CR 2026-173-001 (Superior Ct. Ariz. Mar. 16, 2026)

1

(hereinafter "Kalshi Information," attached as Ex. A). The 20-count criminal information alleges that Kalshi accepted bets from Arizona residents on a wide range of events in violation of Arizona law. *Id.* Among the charges are four counts of election wagering, including bets on the 2028 presidential race, the 2026 Arizona gubernatorial race, the 2026 Arizona Republican gubernatorial primary, and the 2026 Arizona Secretary of State race. The criminal information also contains 16 counts of betting and wagering, including bets on professional and college sporting contests, proposition bets on individual player performance, and whether the SAVE Act would become law. *Id.* Arizona Attorney General Kris Mayes issued a press release on March 17, 2026 announcing the filing of criminal charges against Kalshi.[1] In the press release, Mayes stated that "Arizona law prohibits operating an unlicensed wagering business, and separately bans betting on elections outright." *Id.* Defendants assert that Arizona law permits defendants to regulate and even criminalize markets over which Congress has granted "exclusive jurisdiction" to regulate to the CFTC.

3.  In May 2025, the ADG claimed that "Kalshi is not licensed [in Arizona] and its operation of event wagering in Arizona is illegal." Ex. A. Additionally, in September 2025, the ADG issued a "Notice Regarding Prediction Markets," taking the position that "[o]ffering or selling event contracts to persons located within Arizona without a license from the Department violates Arizona law." Ariz. Dept. of Gaming, "Notice Regarding Prediction Martkets," (Sept. 15,

---

[1] Press Release, Kris Mayes, Att'y Gen. of Ariz., Attorney General Mayes Charges Kalshi With Illegal Gambling Operation, Election Wagering in Arizona (Mar. 17, 2026), https://www.azag.gov/press-release/attorney-general-mayes-charges-kalshi-illegal-gambling-operation-election-wagering.

2

2025), https://resources.sbcamericas.com/sbcamericas/2025/09/2025-09-15_Notice_Letter_to_Operators_Redacted.pdf.

4. Defendant Mayes has targeted Kalshi's contracts elsewhere, too. In her official capacity as Arizona's Attorney General and on behalf of the State of Arizona, Defendant Mayes has signed multiple amicus briefs that claim Kalshi is violating comparable state laws by offering sports event contracts. *See*, *e.g.*, Brief of Amici Curiae, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Mar. 10, 2026), Dkt. 76. Those amicus briefs argue that states, not the CFTC, have the sole power to regulate Kalshi's sports event contracts. And although those cases were focused particularly on Kalshi's sports event contracts, the positions advanced by the amicus briefs could apply to all of Kalshi's contracts.

5. Defendants seek to prohibit CFTC-regulated "Designated Contract Markets" ("DCMs") from operating in Arizona and offering Arizona customers access to event contracts—a type of derivative instrument regulated by federal law that, absent certain narrow exceptions, can be traded only on CFTC-regulated exchanges in transactions facilitated by CFTC-regulated intermediaries.

6. Arizona's attempt to shut down federally regulated DCMs intrudes on the exclusive federal scheme Congress designed to oversee national swaps markets. Prompted by the evolution of national financial markets and repeated conflicts with state law, Congress enacted the CEA, granting the CFTC exclusive jurisdiction to regulate those markets and enacting a comprehensive federal regulatory framework that preempts state laws that attempt to regulate the operation of, or transactions on, CFTC-regulated exchanges. This comprehensive federal regulatory scheme preempts Arizona law as applied to event contracts traded on federally regulated exchanges.

3

7. Event contracts are derivative instruments that enable parties to trade on their predictions about whether a future event—which may relate to economics, or elections, or climate, or sports, or anything else with a potential financial, economic, or commercial consequence—will occur. When structured as "swaps" or futures contracts as defined by the CEA, and traded on CFTC-regulated exchanges, they are subject to the exclusive jurisdiction of the CFTC.

8. As of the date of filing of this complaint, at least eight CFTC-regulated DCMs have collectively self-certified with the CFTC more than 3,000 event contracts pursuant to CFTC Rule 17 C.F.R. § 40.2.

9. Defendants have made clear that they believe event contracts, including sports-related event contracts listed on CFTC-regulated DCMs, are wagers, rather than swaps, and so may be offered only by firms that have obtained a license from the Arizona Department of Gaming.

10. Defendants misapprehend both the nature of these contracts offered on CFTC-regulated DCMs and the federal regulatory framework. Event contracts, including sports-related or political event contracts that are listed on DCMs, are covered by the CEA, and the CEA prohibits States from invading the CFTC's exclusive jurisdiction over event contract transactions offered by and executed on federally regulated DCMs. By prohibiting these DCMs from operating in Arizona without an Arizona license or by conditioning their operation on compliance with Arizona laws and regulations, Defendants directly interfere with Plaintiffs' authority pursuant to the federal scheme imposed by Congress through the CEA.

11. Because Defendants' actions asserting regulatory authority over DCMs directly conflict with the CEA and rules promulgated by the CFTC under the CEA, those actions are preempted. This Court should put an end to the ongoing

4

efforts by Defendants to undermine the uniform application of federal law by declaring that Arizona laws regarding event wagering, betting and wagering, and election wagering are preempted by federal law as applied to event contract swaps listed for trading on CFTC-regulated DCMs and are thus unlawful.

12. Unless restrained and enjoined by the Court, Defendants are likely to continue their attempts to subvert federal law and the exclusive jurisdiction to regulate event contract swaps conferred on the CFTC by Congress. Plaintiffs request that this Court enjoin the enforcement of these laws as applied to commodity derivatives markets and swaps traded on DCMs.

## II.    JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). This action presents a federal question under the laws and Constitution of the United States because it concerns whether the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*, preempts Arizona's gambling laws insofar as they purport to regulate transactions on a CFTC-regulated DCM.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because at least one defendant resides in this district and all defendants are residents of the State.

15. The Court has the authority to provide the relief requested under the Supremacy Clause, U.S. Const. art. VI, cl. 2, as well as 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

5

### III.    PARTIES

16.    Plaintiff the United States of America regulates U.S. financial markets, and it enforces federal commodity derivatives laws through its agency, the CFTC.

17.    Plaintiff the CFTC is an agency of the United States Government that regulates U.S. financial markets, and it enforces federal commodity derivatives laws through its Executive Agency the Commodity Futures Trading Commission.  The CEA grants the CFTC authority to represent itself through its General Counsel.  7 U.S.C. § 2(a)(4).

18.    Defendant State of Arizona is a state of the United States.

19.    Defendant Katie Hobbs is the Governor of Arizona and is sued in her official capacity.  Under the Arizona Constitution, the Governor of Arizona has "shall transact all executive business with the officers of the government, civil and military," and "shall take care that the laws be faithfully executed." Ariz. Const. art. 5, § 4.

20.    Defendant Kris Mayes is the Attorney General for the State of Arizona and is sued in her official capacity.  The Attorney General of Arizona is the state's chief legal officer. The Office of the Attorney General has locations in Phoenix, Tucson and Prescott within the District of Arizona.

21.    Defendant Arizona Department of Gaming ("ADG") is the Arizona state agency that regulates gambling in the State of Arizona.  The ADG oversees licensing, regulating, investigating and penalizing casino operators, management companies, holding companies, key employees, casino gaming employees, and gaming-related vendors in Arizona.

22.     Defendant Jackie Johnson is sued in her official capacity as Director of the ADG.

23.     Defendant Douglas Jensen is sued in his official capacity as Chief Law Enforcement Officer of the ADG.

## IV.     OTHER RELVANT ENTITIES OR AGENCIES

24.     KalshiEx LLC ("Kalshi") is a CFTC Designated Contract Market. Kalshi obtained CFTC designation as a Contract Market on November 3, 2020. Kalshi does business in the United States using the name "Kalshi" and offers products and transactions including event contract swaps through its website, www.Kalshi.com.

25.     North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America ("NADEX" or "Crypto.com") is a CFTC Designated Contract Market.  NADEX obtained CFTC designation as a Contract Market in 2004. NADEX was acquired by Foris DAX Markets, Inc. in March 2022 and now does business under the names NADEX and Crypto.com.  NADEX offers products and transactions including event contract swaps through its websites, nadex.com and crypto.com.

26.     Robinhood Derivatives LLC ("Robinhood") is a CFTC-registered Futures Commission Merchant ("FCM"). Robinhood obtained CFTC designation as an FCM on November 23, 2010. Robinhood offers event contract swaps in partnership with DCMs.

## V.     FEDERAL LAW GOVERNING COMMODITY DERIVATIVES MARKETS

7

**A.   Congress Vested the CFTC with Exclusive Regulatory Authority Over U.S. Commodity Derivatives Markets**

27.     The Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3.  The Constitution also vests the President of the United States with the "executive Power," U.S. Const. art. II, § 1, and authorizes the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

28.     Based on its enumerated constitutional and sovereign powers to regulate interstate commerce, the United States has broad authority to regulate futures and derivatives markets.  That authority includes the power to enforce the supremacy of federal law regulating futures and derivatives markets.

29.     The United States has well-established, comprehensive, and preemptive authority to regulate U.S. financial markets.  The CEA is the federal statute that provides a comprehensive federal framework for the regulation of commodity derivatives transactions in the United States.

30.     The CFTC is the federal executive agency charged with administering and enforcing the CEA.  Congress created the CFTC in 1974 to establish a uniform national system for regulating futures trading after concluding that the then-existing patchwork of state-by-state regulation had impaired the development and functioning of national commodity derivatives markets.  *See* H.R. Rep. No. 93-975, at 51 (1974); S. Rep. No. 93-1131, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5885.

31.     Derivatives are financial instruments such as futures, options, or swaps that derive their value from something else, like a benchmark or a physical commodity.  In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

8

32.    The CEA requires that, subject to certain exemptions or exceptions, commodity derivative transactions must be conducted on exchanges designated by, or registered with, the CFTC.  For example, trading of commodity futures contracts must be conducted on a board of trade designated by the CFTC as a contract market or a registered foreign board of trade (*see* 7 U.S.C. § 6 and 17 C.F.R. § 48.3); no person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or designated as a contract market (*see* 7 U.S.C. § 7b-3(a) and 17 C.F.R. § 37.3); commodity options must likewise be conducted on a board of trade designated as a contract market (*see* 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2).

33.    The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the Act] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  7 U.S.C. § 5(b).

34.    Designated Contract Markets are boards of trade or exchanges that operate under the regulatory oversight of the CFTC pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  The CFTC designates a board of trade as a contract market through a formal application process through which an applicant board of trade must demonstrate its ability to comply with detailed statutory requirements called "core

9

principles." 7 U.S.C. § 7(d).  These core principles require, among other things, that DCMs:

a. Establish, monitor, and enforce compliance with the rules of the market including (i) access requirements, (ii) the terms and conditions of any contracts to be treaded, and (ii) rules prohibiting abusive trade practices;

b. Have the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the market;

c. List only contracts that are not readily susceptible to manipulation;

d. Have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures, including (i) methods for conducting real-time monitoring of trading and (ii) comprehensive and accurate trade reconstructions;

e. Provide a competitive, open and efficient market and mechanism for executing transactions that protects the price discovery process;

f. Maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information (i) to assist in the prevention of customer and market abuses and (ii) to provide evidence of any violations of the rules of the contract market;

g. Establish and enforce rules and procedures for ensuring the financial integrity of transactions and the protection of customer funds; and

h. Establish and enforce rules (i) to protect markets and market participants from abusive practices committed by any party and (ii) to promote fair and equitable trading on the contract market.

35.    The CFTC has enacted detailed rules governing the process through which a board of trade can achieve designation as a contract market, and detailed rules governing the operations of the contract market once that designation is in place.  17 C.F.R. § 38, *et seq.*  DCMs may list for trading commodity futures, options, or swaps as permitted by Part 38 of the CFTC's regulations, 17 C.F.R. § 38, *et seq.*

35. Event contracts listed on CFTC-regulated DCMs are a type of "swap" as defined by the CEA. Section 1a(47) of the CEA, 7 U.S.C. § 1a(47), broadly defines "swap" to include "any agreement, contract, or transaction"—

> (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

> (ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence; . . .

> (iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap . . . [or,]

> (vi) that is any combination or permutation of, or option on, any agreement,

> contract, or transaction described in any of [these clauses].

36. The CEA and CFTC Regulations establish important protections for derivatives markets, market participants, and the general public by creating uniform regulations of a nationwide—and often international—market. For example, DCMs must conform to core principles that are designed to achieve the prevention of market abuse (7 U.S.C. § 7(d)(12)(A)); ensure their financial stability (7 U.S.C. § 7(d)(21)); protect their information security (17 C.F.R. § 38.1051(a)(2)); and safeguard their systems in the event of a disaster (17 C.F.R. § 38.1051(a)(3)). Further, DCMs must ensure that the contracts that they list for trading are "not readily susceptible to manipulation" (7 U.S.C. § 7(d)(3)); DCMs must "prevent market disruption" (7 U.S.C. § 7(d)(4)); DCMs must impose position limits designed to reduce the potential threat of market manipulation or congestion (7 U.S.C. § 7(d)(5)); DCMs must establish and enforce rules to minimize conflicts of interest (7 U.S.C. §

11

7(d)(16)); DCMs must provide impartial access to traders (17 C.F.R. § 38.151); and DCMs must maintain and retain important records and provide them to the Commission (7 U.S.C. § 7(d)(18)). And the CEA conferred on the CEA enforcement authority to "bring an action in . . . [a] district court . . . to enjoin . . . or enforce compliance with [the CEA]" if "it shall appear to the Commission" that any "person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future deliver or any swap." 7 U.S.C. § 13a-1(a).

37.    Today there are 25 exchanges in the United States have active designations from the CFTC to operate as a contract market. These DCMs include KalshiEx.

**B. State Attempts to Shut Down National Markets Drives Early Derivatives Regulation**

38.    By the mid-nineteenth century, commodity exchanges in major trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation. But States and courts impeded these new markets, often failing to distinguish between futures trading and "gambling" or "wagering," with many states even prohibiting futures trading as a form of gambling. *See, e.g., Irwin v. Williar*, 110 U.S. 499, 508-09 (1884) (describing futures contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain").

39.    Indeed, some states criminalized futures contracts. *See Melchert v. Am. Union Tel. Co.*, 11 F. 193, 196 (C.C.D. Iowa 1882) (quoting Ill. Rev. Stat. 1874, § 138). In 1888, the Illinois Supreme Court described "dealing in 'futures' or

12

'options'" as "a crime against the state, a crime against the general welfare and happiness of the people, a crime against religion and morality, and a crime against all legitimate trade and business." *Cothran*, 16 N.E. at 648.

40.    Nevertheless, the Supreme Court and Congress acknowledged that futures markets served a valuable economic function and should be given room to develop.  As Justice Holmes and the Supreme Court noted in *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 247-48 (1905):

> People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain.

41.    Congress, recognizing the value of these new markets and the negative effects of a patchwork of state regulation, centralized the oversight and regulation of futures trading on federally regulated contract markets.  The first federal legislation designed to create a comprehensive federal regulatory framework for futures markets was the Future Trading Act of 1921, Pub. L. No. 67-66, 42 Stat. 187 (1921) ("21 Act"), followed by the Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922) ("22 Act").  In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, even over objections that the new legislation would displace some States' regulations.  *Cf.* H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.) (objecting that the bill was "designed to . . . more or less eliminate some of the most important police powers of several sovereign States").

13

42.    Congress expanded federal oversight of futures markets in 1936 with the Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936).  But even as market participants expanded futures markets beyond their agricultural origins, those market participants continued to face the persistent threat of state prosecution through a patchwork of state laws and regulations.

**C. Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974**

43.    In 1973, futures exchanges recommended that "federal policy . . . be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions."  Review of Commodity Exch. Act and Discussion of Possible Change: Hearings Before the H. Comm. on Agric., 93d Cong., 1st Sess. 121 (1973).  Congress quickly responded, explicitly addressing the issue the following year when it passed the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 88 Stat. 1389 (1974) ("CFTC Act of 1974").

44.    With the passage of the CFTC Act of 1974, Congress amended the CEA to explicitly give the CFTC "exclusive jurisdiction" over commodity derivatives transactions including futures, options, and swaps traded on federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A).  The CFTC Act of 1974 amendments to the CEA worked a sea change in the regulation of U.S. derivatives markets in three critical ways.  First, Congress established the CFTC, vesting in this federal executive agency the authority to administer the CEA.  Second, Congress expanded the scope of the CEA to cover "all commodities."  Third, Congress expressly gave the CFTC "exclusive jurisdiction" over U.S. commodity futures and options markets.

45.    The CFTC Act of 1974 amended Section 2 of the CEA to provide that "the Commission shall have exclusive jurisdiction with respect to accounts,

14

agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' . . . , and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market."  CFTC Act of 1974, Section 201(b), 88 Stat. at 1395 (codified at 7 U.S.C. § 2(a)(1)).

46.    Preemption was an express goal of the CFTC Act of 1974.  Congress recognized the need for uniform, nationwide regulation of futures and options markets because concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos."  See Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).  Potentially limiting language was stricken from the statute "to assure that Federal preemption is complete."  120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis).  The CFTC Act of 1974 "preempt[ed] the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern."  H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897.

**D. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction After 1974**

47.    Amendments to the CEA between 1978 and 2010 repeatedly reinforced and clarified the CFTC's exclusive jurisdiction over futures and options.

48.    In the Futures Trading Act of 1978 ("78 Act"), Congress preserved the CFTC's exclusive authority over futures transactions on CFTC-regulated DCMs while clarifying the states' ability to pursue certain violations of the CEA against

15

actors other than federally regulated exchanges.  The 78 Act added a section to the CEA authorizing states to bring actions for injunctive or monetary relief for specified violations of the CEA and to enforce their "general civil or criminal antifraud" statutes.  See 78 Act, Pub. L. 95-405, § 15(7), 92 Stat. 865, 873 (1978).  Other than this explicit authorization of state authority, the CEA retained the broad preemption of state laws put in place in 1974.  Proposals to carve off pieces of the CFTC's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority."  S. Rep. No. 95-850, at 111-12 (1978), reprinted in 1978 U.S.C.C.A.N. 2087, 2110-11.  That "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC."  *Id.*  Congress also further added to the list of justifications supporting the CFTC's exclusive jurisdiction over commodity derivatives, citing concerns over "costly duplication and possible conflict of regulation or over-regulation."  *Id.*

49.     The Futures Trading Act of 1982 (the "82 Act") further clarified the scope of the CEA's preemption of other federal and state laws and the role of the States in pursuing illegal or fraudulent off-exchange transactions, while still recognizing "the CFTC['s] exclusive jurisdiction to regulate futures trading and enforce the provisions of the Act, thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, at 44-45 & 102-03 (1982), reprinted in 1982 U.S.C.C.A.N. 3871, 3893-94 & 3951-52.  First, the 82 Act clarified the procedures for States to pursue violations of the CEA's anti-fraud provisions in state court.  Second, the 82 Act clarified the role of states with respect to off-exchange futures transactions. Language was added to permit "criminal prosecution under any federal criminal

16

statute" and the application of federal or state laws to off-exchange transactions or unregistered market participants. 82 Act, Pub. L. 97-444, § 229, 96 Stat. 2294, 2318 (1982). Other state laws that could arguably apply to DCMs and market participants registered with the CFTC remained preempted. See H.R. Rep. No. 97-565, at 44-45 & 102-103, 1982 U.S.C.C.A.N. at 3893-94, 3951-52. Congress explained that it "continue[d] to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures," "recognizing the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform enforcement of the Act." *Id.*

50.    In 1992, Congress again adjusted its regulatory framework to capture a new type of derivative financial product: swaps. In the Futures Trading Practices Act of 1992 ("92 Act"), Pub. L. 102-546, 106 Stat. 3590 (1992), Congress gave the CFTC authority to "exempt" certain off-exchange ("over-the-counter" or "OTC") swap transactions from the CEA's mandatory exchange trading regime for futures and options. The 92 Act added language to CEA Section 12(e), 7 U.S.C. § 16(e), expressly "supersed[ing] and preempt[ing] the application of any State or local" gambling or bucket shop laws as applied to OTC derivatives (swaps) transactions that the CFTC had exempted pursuant to its new authority in CEA Section 4(c), 7 U.S.C. § 6(c). While the 82 Act reserved to the States some authority to apply state and local laws to off-exchange futures transactions, the 92 Act cut back state authority for off-exchange swaps that received an exemption from the CFTC. Congress's goal was, again, to provide "legal certainty under both the Act and state gaming and bucket shop laws for transactions covered by the terms of an exemption." H.R. Rep. No. 102-978, at 80 (1992) (Conf. Rep.), reprinted in 1992 U.S.C.C.A.N. 3179, 3212.

17

51.     Congress again limited the authority of States to regulate derivatives transactions in 2000 with the passage of the Commodity Futures Modernization Act of 2000 ("CFMA"), Pub. L. No. 106-554, Appendix E & § 103, 114 Stat. 2763A-365, 2763A-377 (2000).  The CFMA exempted or excluded swap transactions from the CEA's exchange trading requirements while also preempting the application of state and local laws to those "excluded" swap transactions.  The existing preemption of state and local laws as to on-exchange transactions therefore remained in place, and the preemption of state and local laws as to off-exchange transactions (exempt or excluded swaps) was expanded.

**E. Congress Embraced Preemption for Swaps Transactions in the Dodd Frank Act**

52.     In the wake of the 2008 financial crisis, Congress reworked the regulatory structure for the swaps market, creating a framework within the CEA for the on-exchange execution, clearing and reporting of vast portions of those swaps. The 2010 Dodd-Frank Act expressly extended the CFTC's "exclusive jurisdiction" to encompass "transactions involving swaps," eliminating the remaining concurrent jurisdiction of States as to off-exchange swap transactions. *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A).  After Dodd-Frank, Congress had removed all authority for States to regulate swaps of any kind, creating a complete framework for the CFTC's exclusive jurisdiction and occupying the regulatory field.

53.     In the Dodd-Frank Act, Congress made clear that the CFTC has exclusive jurisdiction over event contracts.  In CEA § 5c(c)(5)(C) (codified at 7 U.S.C. § 7a-2(c)(5)(C)), Congress provided the CFTC with specific oversight and prohibitory authority over event contracts.  Under § 5c(c)(5)(C), the CFTC "may determine" that event contracts involving certain categories "are contrary to the

18

public interest" and may not be listed on CFTC-regulated markets.  7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii).

54.     By creating a specific public interest review process, Congress signaled that these contracts belong within the CFTC's exclusive regulatory purview, not the States'.

### F.  The CFTC Uses Its Authority to Carry Out Congress's Directives

55.     The CEA confers on the CFTC the authority to make rules governing swaps and other futures and derivatives contracts.  See, *e.g.*, 7 U.S.C. §§ 2, 6, 6s, 7. Pursuant to that authority, the CFTC has for decades promulgated rules that regulate a large, nationwide industry and which seek to provide clarity to the industry, market participants, and the public.  See 17 C.F.R. § 1.1, *et seq*.

56.     Part of the CFTC's responsibilities include issuing guidance and promulgating new rules to provide certainty when markets change and innovate.  The CFTC already has extensive rules on what a DCM must do to become certified with the Commission, see 17 C.F.R. Part 38, and what a DCM must do to either self-certify a contract before listing, see 17 C.F.R. § 40.2, or to submit a contract for the CFTC to approve, see 17 C.F.R. § 40.3.

57.     With respect to event contracts, the CFTC recently published an advisory letter to DCMs on prediction markets and event contracts, Prediction Markets Advisory, CFTC Letter No. 26-08 (Mar. 12, 2026) (see CFTC Prediction Markets Advisory Press Release, https://www.cftc.gov/PressRoom/PressReleases/9193-26 (last visited 3/18/2026)).

58.     In order to provide additional clarity in the marketplace, the CFTC is in the process of writing and revising its rules applicable to event contracts and prediction markets.  On March 16, 2026, the CFTC published in the Federal Register

19

an advance notice of proposed rulemaking soliciting public comments on prediction markets, 91 Fed. Reg. 12516 (Mar. 16, 2026).

### VI. ARIZONA ISSUES CEASE AND DESIST LETTER TO AND FILES CRIMINAL CHARGES AGAINST A CFTC-DESIGNATED CONTRACT MARKET

59.    On May 21, 2025, the Arizona Department of Gaming, through its Chief Law enforcement Officer Douglas Jensen, issued a cease-and-desist letter to KalshiEx LLC and its CEO.  The letter accuses Kalshi of accepting illegal wagers in violation of Arizona law.  The letter also states:

a.  Kalshi is "taking wagers, defined in A.R.S. § 5-1301(23)(a) as 'a sum of money or thing of value risked on an uncertain occurrence'" because it is offering contracts on the outcome of future events including sports.

b.  "'Event wagering' is defined in Arizona to mean, 'accepting wagers on sports events or other events … by any system or method of wagering, including in person or over the Internet through websites and on mobile devices.' A.R.S. § 5-1301(4)(a)."

c.  "The operation of event wagering in Arizona is allowed only if conducted pursuant to A.R.S. § 5-1301 et seq., which requires, among other things, licensure."

d.  Kalshi is committing a "crime in Arizona" by engaging "in the business of accepting wagers 'with respect to the result or purported result of any race, sporting event, contest or other game of skill or chance or any other unknown or contingent future event or occurrence whatsoever.' A.R.S. § 13-3305(A)."

60.    The Arizona cease and desist letter states that Kalshi is engaged in "event wagering" activity in Arizona over the Internet and on mobile devices.  The letter directs that "Kalshi cease gambling operations in Arizona and desist from engaging in those activities in the future."  It also states that "Kalshi is subject to a potential restitution award for those who lost money, and an action forfeiting all monies it acquired, because of its illegal conduct," citing A.R.S. §§ 13-804 and 13-2314.

20

61.     On March 16, 2026, the State of Arizona filed a criminal Information, charging KalshiEx LLC and Kalshi Trading LLC with violations of Arizona law. The Information filed by Arizona charges Kalshi with "Betting and Wagering" in violation of A.R.S. §§ 13-3305, 13-3301, 13-301, 13-302, 13-303, 13-304, 13-305, 13-707, 13-802, and 13-803 in Counts 1-9, 11, 13-17, and 20.  The Information charges Kalshi with "Election Wagering" in violation of A.R.S. § 16-1015, 16-201 – 16-250, 13-301, 13-302, 13-303, 13-304, 13-305, 13-707, 13-802, and 13-803 in Counts 10, 12, 18, and 19.

62.     Kalshi and DCMs like it provide event contracts available for trades, as regulated under the CEA and supervised by the CFTC.  Each of these companies has been designated as a contract market under 17 C.F.R. Part 38 and lists these event contracts through the self-certification process outlined in 17 C.F.R. § 40.2 or the submission process outlined in 17 C.F.R. § 40.3.

63.     Defendants' attempt to regulate and criminally prosecute DCMs interferes with Plaintiffs' exclusive authority to uniformly regulate and monitor this congressionally defined market. The entire point of the CEA is to create a uniform and predictable nationwide market for futures trading, and the CFTC oversees that market via its certification process of DCMs and its requirements for DCMs to comply with the self-certification or submission certification requirements before listing event contracts. Defendants' prosecutions and threatened regulatory action undermines that uniformity, thwarts Congress's scheme, and intrudes on Plaintiffs' exclusive jurisdiction. Defendants' approach makes it much more difficult for the CFTC to regulate, advise, and enforce its authority over the DCMs, wasting resources and subverting CFTC's congressionally mandated authority.

21

## VII.  THE CHALLENGED ARIZONA STATUTES ARE PREEMPTED AS APPLIED TO COMMODITIES DERIVATIVES CONTRACTS

64.    The Constitution's Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

65.    The CEA, as continuously refined over more than a century, gives the CFTC "exclusive jurisdiction" over futures and swaps traded on a DCM.  7 U.S.C. § 2(a)(1)(A). The CEA "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980).  "[P]reemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (quoting *Am. Ag. Movement v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992)).

66.    "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (internal citation omitted); *see Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (Under the Supremacy Clause, state laws that conflict with federal law are "without effect."); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (same); *Time Warner Cable v. Doyle*, 66 F.3d 867, 874 (7th Cir. 1995) ("Congress, in the exercise of the legislative authority granted to it by the Constitution, may preempt state law." (citation omitted)). "A federal law may preempt a state law expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption." *Boomer v. AT & T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002).

22

67.    "Express preemption occurs when a federal statute explicitly states that it overrides state or local law." *Hoagland v. Town of Clear Lake,* 415 F.3d 693, 696 (7th Cir. 2005).   Congress explicitly preempted state regulation of commodity derivatives transactions, vesting the Commission with "exclusive jurisdiction," except as otherwise expressly provided by Congress, over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery."   7 U.S.C. § 2(a)(1)(A).   And Congress has repeatedly expanded the CFTC's "exclusive jurisdiction" through continual amendments, most recently to include "transactions involving swaps."   *Id*.; see also ¶¶ 38-54, *supra*.   Congress therefore preempted state regulation of transactions subject to the CFTC's "exclusive jurisdiction," including swaps, and the DCMs that list them.

68.    Even without the express language of the CEA preempting state regulation, any state interference in DCM regulation is preempted because Congress "occupied the field" via the CEA and the CFTC and because any attempt at state regulation conflicts with federal law.   *See Boomer,* 309 F.3d at 417.   In general, state law must give way if "Congress, acting within its proper authority, has determined must be regulated by its exclusive governance" or where "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"   *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

69.    The scope of the CEA and the long history of Congress's amendments to ensure federal law captured the evolving futures and derivatives markets makes clear that Congress intended to occupy the field. A field is preempted from state regulation "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).   Such

23

is the case here. CEA § 2(a)(1)(A) makes plain that Congress intended the CEA to occupy the field of "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market . . . or any other board of trade, exchange, or market." When an instrument is trading on a CFTC-regulated market as a "swap" or "future," state gambling laws do not apply.

70. Offering event contracts on a DCM cannot, in and of itself, be an activity that is unlawful under any state law because such an application of state law would conflict with the CEA. "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001).

71. A State applying local gambling laws to federally regulated DCMs also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted). To the extent state laws could apply to federally regulated swaps and derivatives, those laws are preempted as applied to those transactions and market participants because complying with both state and federal law would be an impossibility, and because those state laws, as applied, obstruct Congress's clear intent.

72. Complying with both state regulations and the CEA is impossible because a DCM is required by federal law to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). If a state bans the contract, the DCM cannot fulfill its federal mandate to provide impartial national access. Other state-imposed restrictions on access to markets would similarly make it impossible for the regulated DCMs to comply with federal regulations. The CEA reflects

24

Congress's understanding that commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, and surveillance of financial instruments traded in these markets to prevent the type of fragmented oversight at risk in this case. Complying with fractured state regulations would derail that goal.

73. State gambling regulations, as applied to DCMs, also "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted). State gambling laws often require local licensing, fees, enforcement, and specific hardware. Applying state-by-state local requirements to national commodity exchanges would create the very "patchwork" that Congress set out to prevent. Indeed, the history of the CEA demonstrates repeated efforts by Congress to protect nationwide markets under uniform federal regulation as those markets evolve and as states attempt to limit them. See ¶¶ 38-54, *supra*.

74. In enacting the CEA and expanding it over time to provide the framework for commodity derivatives markets in the United States, Congress found that commodity derivatives transactions "are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovery prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a).

75. Therefore, the federal Commodity Exchange Act which provides the CFTC with "exclusive jurisdiction" over transactions on CFTC Designated Contract Markets, 7 U.S.C. § 2, preempts Arizona statutes that purport to prohibit, limit, or

25

condition the listing or trading of event contract swaps on CFTC-Designated Contract Markets.

## VIII.    CLAIMS FOR RELIEF

### A.    COUNT I – A.R.S. §§ 5-1301 – 5-1321 (EVENT WAGERING) VIOLATES THE SUPREMACY CLAUSE AS APPLIED TO TRANSACTIONS ON CFTC DESIGNATED CONTRACT MARKETS

76.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

77.    Title 5, Chapter 11 of the Arizona Revised Statutes §§ 5-1301 *et seq.*, sets out a state regulatory scheme for event wagering in Arizona.

78.    "Event wagering" is defined as "accepting wagers on sports events or other events, portions of sports events or other events, the individual performance statistics of athletes in a sports event or combination of sports events or the individual performance of individuals in other events or a combination of other events by any system or method of wagering, including in person or over the Internet through websites and on mobile devices."  A.R.S. § 5-1301(4)(a).

79.    Among other things, Arizona event wagering law states that "[e]vent wagering may be conducted only to the extent that it is conducted in accordance with this chapter."  A.R.S. § 5-1303(A).  Further, "[a] person may not offer any activity in connection with event wagering in this state unless all necessary licenses have been obtained in accordance with federal and state law and any applicable rules of the department."  *Id.*

80.    A.R.S. § 5-1314(A) states that "the operation of event wagering is lawful only if the event wagering is conducted in accordance with this chapter and any other relevant laws and rules."

81.    A.R.S. § 5-1315 prohibits certain event wagers, including:

26

> 1.      Injuries, penalties and other types or forms of event wagering under this chapter that are contrary to law.
>
> 2.      Individual actions, events, occurrences or nonoccurrences to be determined during a collegiate sports event, including on the performance or nonperformance of a team or individual participant during a collegiate sports event. This paragraph does not prohibit wagers on the overall outcome of a collegiate sports event or seasonal awards based on a player's cumulative overall play.

A.R.S. §§ 5-1315(A)(1)-(2).

82.    A.R.S. § 5-1315(B) provides: "[a]n event wagering operator may offer only parlay and proposition bets of the type or category as prescribed by the department [of gaming]. The department [of gaming] shall prescribe the types and categories of parlay and proposition bets that may be offered in this state, if any."

83.    A.R.S. §§ 5-1301 – 5-1321, as applied to transactions listed, offered, or executed on Designated Contract Markets, is field preempted by Congress's grant of broad regulatory authority over this market to the CFTC in the Commodity Exchange Act, see generally, 7 U.S.C. § 2.

84.    A.R.S. §§ 5-1301 – 5-1321, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is expressly preempted by the Commodity Exchange Act, 7 U.S.C. §§ 2(a)(1)(A), 16(e).

85.    A.R.S. §§ 5-1301 – 5-1321, as applied to transactions listed, offered, or executed on Designated Contract Markets, are field preempted by Congress grant of broad regulatory authority over this market to the CFTC in the Commodity Exchange Act, see generally, 7 U.S.C. § 2.

86.    A.R.S. §§ 5-1301 – 5-1321, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, are implicitly preempted because they make it impossible for regulated DCMs to comply with federal law and

27

are obstacle preempted because they thwart Congress's purpose in granting the CFTC exclusive regulatory authority over this market.

**B.    COUNT II – THE ARIZONA CRIMINAL CODE, A.R.S. §§ 13-3301 – 13-3312 (GAMBLING), VIOLATES THE SUPREMACY CLAUSE (PREEMPTION) AS APPLIED TO TRANSACTIONS ON CFTC DESIGNATED CONTRACT MARKETS**

87.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

88.    The Arizona Criminal Code § 13-3305 makes it an offense to engage in betting or wagering absent an applicable exception.

89.    A.R.S. § 13-3305(A) provides:  "Subject to the exceptions prescribed in section 5-112 and title 5, chapter 11, no person may engage for a fee, property, salary or reward in the business of accepting, recording or registering any bet, purported bet, wager or purported wager or engage for a fee, property, salary or reward in the business of selling wagering pools or purported wagering pools with respect to the result or purported result of any race, sporting event, contest or other game of skill or chance or any other unknown or contingent future event or occurrence whatsoever."

90.    A.R.S. § 13-3305(B) provides:  "Subject to the exceptions prescribed in title 5, chapter 11, a person shall not directly or indirectly knowingly accept for a fee, property, salary or reward anything of value from another to be transmitted or delivered for wagering or betting on the results of a race, sporting event, contest or other game of skill or chance or any other unknown or contingent future event or occurrence whatsoever conducted within or without this state or anything of value as reimbursement for the prior making of such a wager or bet on behalf of another person."

28

91.    These prohibitions are broad enough to encompass and criminalize as "gambling" many agreements, contracts and transactions offered on CFTC-Designated Contract Markets, including event contract swaps, even though these agreements, contracts and transactions are expressly permitted under the federal Commodity Exchange Act.

92.    The Arizona Criminal Code as applied to transactions listed, offered, or executed on Designated Contract Markets, is field preempted by Congress's grant of broad regulatory authority over this market to the CFTC in the Commodity Exchange Act, see generally, 7 U.S.C. § 2.

93.    The Arizona Criminal Code, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is expressly preempted by the Commodity Exchange Act, 7 U.S.C. §§ 2(a)(1)(A), 16(e).

94.    The Arizona Criminal Code, as applied to transactions listed, offered, or executed on Designated Contract Markets, is field preempted by Congress grant of broad regulatory authority over this market to the CFTC in the Commodity Exchange Act, see generally, 7 U.S.C. § 2.

95.    The Arizona Criminal Code, as applied to transactions listed, offered, or executed on Designated Contract Markets, is implicitly preempted because it makes it impossible for regulated DCMs to comply with federal law and is obstacle preempted because it thwarts Congress purpose in granting the CFTC exclusive regulatory authority over this market.

**C.    COUNT III – A.R.S. § 16-1015 VIOLATES THE SUPREMACY CLAUSE (PREEMPTION) AS APPLIED TO TRANSACTIONS ON CFTC DESIGNATED CONTRACT MARKETS**

96.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

29

97.   Arizona Revised Statute § 16-1015, titled "Election wagers; classification," provides: "A person who, before or during an election provided by law, knowingly makes, offers or accepts a bet or wager, or takes a share or interest in, or in any manner becomes a party to the bet or wager, or provides or agrees to provide money to be used by another in making the bet or wager, upon any contingency whatever arising out of such election, is guilty of a class 2 misdemeanor.

98.   A.R.S. § 16-1015, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is preempted by the federal Commodity Exchange Act, 7 U.S.C. § 2.

99.   A.R.S. § 16-1015 as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is expressly preempted by the federal Commodity Exchange Act, 7 U.S.C. §§ 2(a)(1)(A), 16(e).

100.   A.R.S. § 16-1015, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is field preempted by Congress's grant of broad regulatory authority over this market to the CFTC in the Commodity Exchange Act, see generally, 7 U.S.C. § 2.

101.   A.R.S. § 16-1015, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is implicitly preempted because it makes it impossible for regulated DCMs to comply with federal law and is obstacle preempted because it thwarts Congress purpose in granting the CFTC exclusive regulatory authority over this market.

## IX.   RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

1. That this Court enter a judgment declaring that the challenged provisions, or any other state laws pertaining to gambling or wagering, as applied to

30

CFTC-Designated Contract Markets, violate the Supremacy Clause and are therefore preempted, unconstitutional and invalid;

2. That this Court issue a permanent injunction that prohibits Defendants as well as their successors, agents, and employees, from enforcing the challenged provisions or any other state laws pertaining to gambling or wagering, as applied to CFTC-Designated Contract Markets;

3. That this Court award Plaintiffs their costs and fees in this action; and

4. That this Court award any other relief it deems just and proper.

Dated: April 2, 2026          Respectfully submitted,


By: */s/ Tiberius Davis*

31

*Attorneys for the United States of America*

TIMOTHY COURCHAINE
U.S. Attorney for the District of Arizona
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
(602) 514-7500

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant
Attorney General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
450 5th St NW,
Washington, DC 20001
Tiberius.davis@usdoj.gov
202-860-8970

*Attorneys for the Commodity Futures Trading Commission*

Tyler S. Badgley
    General Counsel
M. Jordan Minot
    Deputy General Counsel
Anne Stukes
    Senior Assistant General Counsel
Carlin Metzger
    Assistant General Counsel
U.S. Commodity Futures Trading Commission
Three Lafayette Center
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 209-1087
Fax:  (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
astukes@cftc.gov
cmetzger@cftc.gov